No. 122,277

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

MID-CONTINENT ANESTHESIOLOGY, CHARTERED,
*Appellee*,

v.

GERARD M. BASSELL
and
ROBERT S. MCKAY,
*Appellants*.

SYLLABUS BY THE COURT

1.

When a party moves for summary judgment and/or judgment as a matter of law, all inferences reasonably derivable from the evidence must be drawn in favor of the nonmoving party. When there are genuine disputes of material fact underlying the claims for which a party is seeking summary judgment and/or judgment as a matter of law, the motion must be denied.

2.

If a party asserts a defense based on the statute of limitations and there are genuine disputes of material fact as to when the opposing party's cause of action accrued, the matter must be submitted to the jury.

3.

When interpreting statutes, the reviewing court must first look to the plain language of the statute. The court must not stray from the statute's plain language where it is clear and unambiguous.

4.

Under K.S.A. 60-513(d), the statute of limitations for claims against a corporation is tolled based on adverse domination when a majority of the corporation's board of directors is alleged to be involved in the wrongdoing underlying the cause of action. The relevant statutory language provides a cause of action does not accrue until "there exists a disinterested majority of nonculpable directors of the corporation." This plain statutory language is clear and unambiguous.

5.

The disinterested nonculpable majority definition of adverse domination under K.S.A. 60-513(d) presents an objective standard. Three relevant facts are needed to determine whether a disinterested nonculpable majority exists: (1) how many directors the corporation had at the time of the alleged wrongdoing; (2) how many of those directors were allegedly involved in the wrongdoing; and (3) how many of the directors not allegedly involved in the wrongdoing stood to benefit by failing to take action on behalf of the corporation to stop the wrongful conduct.

Appeal from Sedgwick District Court; ERIC A. COMMER, judge. Opinion filed December 17, 2021. Reversed and remanded with directions.

*Jay F. Fowler*, *Amy S. Lemley*, and *Jeremy E. Koehler*, of Foulston Siefkin LLP, of Wichita, for appellant Gerard M. Bassell.

*John H. Gibson* and *G. Andrew Marino*, of Gibson Watson Marino LLC, of Wichita, for appellant Robert S. McKay.

*Randall K. Rathbun* and *Jack Scott McInteer*, of Depew Gillen Rathbun & McInteer LC, of Wichita, for appellee.

2

Before SCHROEDER, P.J., WARNER and ISHERWOOD, JJ.

SCHROEDER, J.:  In March 2018, Mid-Continent Anesthesiology, Chartered (MCAC) filed suit against two of its former stockholder physicians—Dr. Gerard M. Bassell and Dr. Robert S. McKay—alleging conversion, fraud, breach of fiduciary duty, and civil conspiracy. Dr. Bassell and Dr. McKay each filed motions for summary judgment, which the district court ultimately denied, and the case proceeded to trial. Both doctors now appeal the jury verdict against them and the district court's denial of their motions for summary judgment based on the statute of limitations.

Based on our extensive review of the record and for reasons we detail below, we find the district court did not err in denying Dr. Bassell's and Dr. McKay's motions for summary judgment. However, we find the district court erred by not submitting a fact question to the jury. Thus, we must reverse and remand with directions for a new trial.

FACTS

MCAC is a corporation owned by its member physicians, all of whom are shareholders. Each shareholder has an equal number of shares in the company and is entitled to equal votes with respect to the corporation's affairs. MCAC was founded in 1984 and functions as a medical group practicing primarily in the area of obstetric anesthesia through contracts with hospitals in the Wichita area. Dr. Bassell was a founding shareholder and served as MCAC's first president, a role he held until his retirement on December 31, 2015. Dr. McKay joined MCAC a few years after its founding and served in various roles, including as president after Dr. Bassell retired, until he was fired by the board of directors of MCAC in August 2017.

During the timeframe relevant to the issues on appeal (March 2008 through August 2017), MCAC's shareholders were Dr. Bassell (prior to January 1, 2016); Dr. McKay (prior to August 22, 2017); and Drs. Greg George, Kimberly Babiash, James Castrisos, Jon Cremin, Dong Dai, Jim Manry, and Doug Cleveland.

MCAC had frequent meetings of its physician shareholders, albeit without the formalities typically associated with corporate meetings. Generally, there were no formal votes; rather, the group made decisions by consensus. MCAC's business manager, Carolyn Holdeman, attended the meetings and observed that all shareholders had an equal opportunity to participate. Likewise, Dr. Manry noted he did not observe any difference between the shareholders and directors; all shareholders functioned fairly equally. But MCAC did have a board of directors. However, MCAC's bylaws did not require the board hold a formal meeting to take a vote on corporate actions; rather, any action could be taken without a meeting if all board members consented to it in writing.

At the time of its founding in 1984, MCAC held a joint meeting of shareholders and directors, delegating authority to Dr. Bassell, as president, to set physician salaries and bonuses. This authority was never rescinded by the board of directors. Dr. Bassell used his authority to set compensation, salaries, and bonuses for the physicians for more than 30 years. Dr. Dai testified he was aware Dr. Bassell had the authority to set the physicians' salaries. Dr. Manry also testified he knew Dr. Bassell set the physicians' salaries, and he believed the other shareholders were all aware of it. After Dr. Bassell retired, Dr. McKay used his authority as MCAC's new president to set the physicians' salaries.

Although all shareholders had an equal stake in the company, their compensation differed. Before Dr. Babiash joined MCAC in August 2010, Drs. Bassell and McKay told her she would be an equal partner in the group but there would be differences in the physicians' pay based on their administrative duties. Dr. Manry was also aware the

4

physicians did not receive equal bonuses; he was told this many times, and it was something Dr. Bassell made clear. Dr. Manry did not recall Dr. Bassell ever telling the other physicians they were all paid equally. Dr. Manry also believed Dr. McKay, after he became president, explained salaries would vary based on administrative duties.

When Dr. Bassell began contemplating retirement, he identified Dr. Babiash as someone with good business acumen who would be well positioned to run MCAC going forward. Dr. Babiash received her bachelor's degree in business administration then enrolled in a dual degree program from which she received her medical degree and a master's degree in business administration. In 2014, Dr. Bassell started having Holdeman send MCAC's daily disbursement reports to Dr. Babiash so she could get a picture of MCAC's finances. These were the same daily reports that were sent to Drs. Bassell and McKay.

Dr. Babiash testified she started regularly receiving bank statements and check registers from the company in August 2014. She claimed she could not make out much from the statements because they only showed lump-sum payments to the physicians, which could vary based on deductions for retirement contributions or adjustments for extra shift pay or administrative pay. At trial, Dr. Babiash identified an exhibit containing the type of information she would receive—MCAC's check register from November 14, 2014, showing Dr. Babiash received a bonus check for $33,000 and Dr. Bassell received a check for $71,900. The register also reflected the amounts the other doctors received for bonuses. Dr. Babiash knew these amounts were net payments, with deductions already taken out, because her pay stubs showed such deductions from her own checks.

Another daily register sent to Dr. Babiash on August 20, 2014, showed she received less in biweekly pay ($8,863.20) than Dr. Bassell ($13,412.34) or Dr. McKay ($9,794.04); the register also showed the amounts received by the other doctors. Multiple other transaction records were sent by email from Holdeman to Dr. Babiash between

5

August 2014 and December 2015 and were admitted as exhibits at trial. One of these was a year-end profit and loss statement reflecting MCAC's total expenditures between April 2014 and March 2015, showing the combined total salaries paid to all physicians. Dr. Babiash admitted she could have divided this figure by the number of physicians in the group to calculate the average salary of MCAC's shareholders then determine whose compensation was above or below average.

Dr. Babiash continued to receive transaction records until Dr. McKay was fired in August 2017. Dr. Babiash conceded the relevant information was known to her as an officer of the company and a member of MCAC's board of directors as of February 16, 2016, and Dr. McKay never told her not to share the records she had been provided. Dr. Babiash had been appointed to MCAC's board of directors in 2015. At that time, the other directors were Drs. Bassell, McKay, and Castrisos. Dr. Manry was then appointed to the board to fill the vacancy that would be created by Dr. Bassell's retirement.

On December 12, 2015, Drs. Bassell, McKay, Castrisos, Babiash, and Manry signed a unanimous consent of the board electing new officers—Dr. McKay as president, Dr. Castrisos as vice president, and Dr. Babiash as secretary-treasurer—effective January 1, 2016. Dr. Babiash admitted she signed the unanimous consent as a director of MCAC and was able to read it when she signed. Dr. Castrisos also acknowledged he signed the unanimous consent as a director, and both he and Dr. Babiash were officers and directors of MCAC as of January 1, 2016. Dr. Castrisos further acknowledged he, Dr. Babiash, and Dr. Manry were three of MCAC's four directors following Dr. Bassell's retirement. Dr. Manry was also aware he had been appointed to the board in December 2015, and he acted as a board member in signing the unanimous consent electing new officers. It was known throughout MCAC, including its board of directors, Dr. Bassell would be retiring at the end of 2015.

On February 16, 2016, the physician shareholders held a meeting, with the intent to make all shareholders directors of MCAC. Dr. Babiash wrote the minutes of the meeting, which stated, in part: "MCAC currently has four board members: Drs. McKay, Castrisos, Manry, and Babiash." The minutes further stated: "The current board will reconvene to amend the Bylaws to allow for all MCAC stockholders to be on the Board." MCAC's bylaws were amended by the existing board members that same day. The following day, Drs. McKay, Castrisos, Babiash, and Manry signed a unanimous consent agreement, stating in part: "[T]he number of directors on the Board of Directors shall be increased to seven . . . ."

On August 12, 2017, the shareholders had a meeting to discuss the state of the business following the loss of MCAC's contract with Surgicare. Dr. George and Dr. McKay had each prepared budgets, but their numbers did not match up. Dr. George said he was going to go to the business office to look at the company's books, and Dr. McKay did not object. The following Monday, August 14, 2017, Drs. George and Cleveland arrived at MCAC's business office, but Holdeman was not aware they were coming. Holdeman contacted Dr. McKay and told him she was uncomfortable because Drs. George and Cleveland were asking a lot of questions and she did not know whether they were allowed to look at the books. Dr. McKay said Dr. George had a right to look at the books because he was a director but was unsure whether Dr. Cleveland did because he was only a shareholder. Dr. McKay advised he would consult with an attorney and get back to Holdeman. In the meantime, Holdeman gave Drs. George and Cleveland everything they requested except the other physicians' salary information. Dr. McKay called back and told Holdeman both doctors could look at the books, but, by that time, the doctors had already left. Within a few days, Dr. George returned to the business office with Dr. Manry and received all the information he and Dr. Cleveland had previously requested.

In reviewing the information, Dr. George discovered a $100,000 payment Dr. McKay made to himself in March 2017. Drs. George and Manry learned this was an advancement McKay made for his annual administrative salary, with the intent to credit it back in the next corporate fiscal year by not taking payments as president of MCAC. Dr. McKay stopped taking pay for administrative salary for four months thereafter. Dr. George gathered relevant corporate documents and financial records before speaking with the other physicians and later consulted with an attorney. Dr. George and the other board members, except Drs. McKay and Manry, further consulted with attorneys and determined they should take steps in accordance with MCAC's bylaws to remove McKay as president and terminate his employment.

The evidence reflects Dr. McKay had consulted with MCAC's accountant to determine the best course of action for tax purposes when MCAC received unexpected income shortly before the end of the fiscal year in March 2017. Dr. McKay consulted with Drs. Babiash and Castrisos, and all three agreed to take an advance in full on their annual administrative salaries—$100,000 for McKay as president; $25,000 for Castrisos as vice president; and $25,000 for Babiash as secretary-treasurer—and forego monthly payments the following fiscal year. Dr. McKay admitted he was confused as to how to characterize the payments for tax purposes. But he did not take administrative pay for the remainder of his employment at MCAC and paid back the rest of the advance in full after he was fired.

On August 22, 2017, MCAC held a meeting of its board of directors. Drs. Babiash, Castrisos, Cremin, Dai, and George attended the meeting as directors. Drs. Manry and McKay were listed as absent. Dr. Cleveland attended the meeting as a shareholder, but one of the purposes of the meeting was to expand the board from seven members to eight, declare a vacancy, and elect Dr. Cleveland to the board. The attending board members unanimously voted in favor of doing so, and Dr. Cleveland immediately became a director and acted as such for the remainder of the meeting. The board then

voted to terminate Drs. McKay and Manry from MCAC and to have MCAC's treasurer arrange for an audit of the company. The board further voted to elect Dr. George as MCAC's new president.

Shortly thereafter, Dr. George contacted his brother-in-law, Roger Seiler, a CPA. Dr. George advised Seiler he believed the past two presidents of MCAC had taken higher salaries than the other doctors and wanted Seiler to review the company's financial records. Seiler observed a discrepancy based on Dr. McKay's self-payment of the $100,000 as an advancement, which was later characterized as a bonus on MCAC's tax return for that fiscal year. Seiler was concerned because an advancement would require repayment, whereas a bonus would not. Seiler also obtained and examined MCAC's financial records dating back to 2012—in total, approximately 3,400 pages. He searched through the records for transactions involving Drs. Bassell and McKay. Seiler then compiled a wage summary reflecting the amounts paid to Drs. Bassell and McKay compared to the other physicians.

Seiler testified the "wage summary . . . clearly articulated and identified how much more the past two presidents had received in compensation versus the rest of the doctors." This was done solely based on math; Seiler just "compar[ed] [the compensation figures] and look[ed] at them." He believed it was inappropriate and contrary to the professional standards of accounting to offer an expert opinion or formal attestation given his relationship to Dr. George.

MCAC subsequently relied on another CPA, Randall Wolverton, as an expert witness. Wolverton determined Dr. Bassell received $6,228,092 in compensation— salary, director's fees, and administrative pay—between March 8, 2008, and the last day of his employment on December 31, 2015. Drs. Castrisos and George received $3,359,447 and $3,212,032, respectively, during the same timeframe. Dr. McKay received $5,674,880 between March 8, 2008, until the last day of his employment on

August 18, 2017. Based on Wolverton's examination of MCAC's financial records, Dr. George believed MCAC suffered damages of $2,260,258 from Dr. Bassell and $1,326,457 from Dr. McKay. Dr. George testified his damages calculation was lower than Wolverton's because Wolverton only compared Drs. Bassell's and McKay's salaries to two other doctors', whereas Dr. George compared them to all the other physicians, and Wolverton had not accounted for permissible pay differences based on each of the doctors' administrative duties.

On March 17, 2018, MCAC filed suit, alleging conversion, fraud, breach of fiduciary duty, and civil conspiracy against Drs. Bassell and McKay. Specifically, MCAC alleged Drs. Bassell and McKay took excess compensation in the form of salaries and bonuses despite Dr. Bassell having frequently told the other doctors that all shareholders were being equally compensated.

Drs. Bassell and McKay each filed motions for summary judgment, asserting MCAC's claims were barred by the statute of limitations because a majority of nonculpable directors existed at least as early as February 16, 2016, and at least one of the nonculpable directors—Dr. Babiash—had knowledge of the various physicians' compensation. MCAC filed a response, to which Drs. Bassell and McKay filed a joint reply.

The motions for summary judgment were set for hearing. At the conclusion of the hearing, the district court made an oral ruling. The district court noted MCAC had previously been ordered to file an amended petition because of a lack of specificity in the allegations underlying its fraud claim and had not timely done so; therefore, the claim would be dismissed. The district court further noted MCAC had voluntarily dismissed its conversion claim. Accordingly, neither claim would be tried. As a threshold matter, the district court also denied the defendants' motion to strike Dr. Babiash's corrections to her deposition testimony, which the defendants alleged was improperly done to avoid

10

summary judgment. The district court then denied Drs. Bassell's and McKay's motions for summary judgment with respect to MCAC's breach of fiduciary duty and civil conspiracy claims.

The matter proceeded to a jury trial. Relevant to its claims at trial, MCAC asserted:

"Beginning in at least 2004 and continuing until he retired and McKay became president, Bassell frequently told the shareholders that the doctors were being treated equally. McKay knew this was not true, but assisted in concealing that fact from the shareholders, in spite of his duty to speak out. The shareholders naturally believed him because each of them held the same exact number of shares.

"The shareholders had no reason to disbelieve the defendants' claims that everyone made nearly the same."

MCAC did not allege any of the other shareholders—Drs. Babiash, Castrisos, Cleveland, Cremin, Dai, George, or Manry—were involved in the purported civil conspiracy or were in any way culpable in the alleged wrongdoing.

At the conclusion of MCAC's evidence, Drs. Bassell and McKay orally moved for judgment as a matter of law, claiming, among other things, the undisputed facts reflected a majority of nonculpable directors existed as early as February 16, 2016, and at least one of the directors had financial information on the corporation as early as sometime in 2014. The district court denied the motions. At the conclusion of all evidence, Drs. Bassell and McKay renewed their motions for judgment as a matter of law, which the district court denied. Drs. Bassell and McKay then requested the district court instruct the jury on the statute of limitations as an affirmative defense to MCAC's claims. However, at the conclusion of all evidence, the district court granted MCAC's motion for judgment as a matter of law as to the statute of limitations claim and denied the requested instruction, finding there was no evidence a nonculpable majority of directors with

11

knowledge of the alleged wrongdoing existed prior to August 2017. The jury returned a verdict in favor of MCAC, finding Drs. Bassell and McKay failed to disclose their compensation, the amount taken was not fair, and it was done in bad faith, which violated their fiduciary duty to MCAC. The jury further found Drs. Bassell and McKay conspired to take excess compensation from MCAC to which they were not entitled. The jury determined Dr. Bassell was liable for damages of $2,260,258; Dr. McKay was liable for damages of $1,326,457; and they had conspired to misappropriate the entire combined sum of $3,586,715.

Additional facts are set forth as necessary herein.

ANALYSIS

On appeal, both doctors claim if there were disputed facts that required their respective motions for summary judgment or motions for judgment as a matter of law to be denied, then there were at least genuine disputes of material fact established by the evidence at trial, which required the district court to instruct the jury to determine if the statute of limitations applied to part of MCAC's claims for relief. Dr. McKay acknowledges the statute of limitations would only preclude a portion of MCAC's claims against him because he was terminated less than two years before MCAC filed suit. Dr. Bassell raises one argument not briefed by Dr. McKay—the district court should have instructed the jury on ratification, authorization, or estoppel. Dr. McKay raises one additional argument not briefed by Dr. Bassell—the district court should have granted Dr. McKay summary judgment on MCAC's civil conspiracy claim because no evidence was presented showing a "meeting of the minds" between himself and Dr. Bassell to engage in the alleged wrongdoing.

12

*Standards of Review and Applicable Legal Principles*

The issues on appeal all arise from the district court's grant or denial of the parties' pretrial motions for summary judgment and motions for judgment as a matter of law at various points during trial. Appellate courts exercise de novo review over a district court's ruling on both a motion for summary judgment and motion for judgment as a matter of law. *Siruta v. Siruta*, 301 Kan. 757, 766, 348 P.3d 549 (2015). A similar legal framework applies to both issues.

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions on file, and supporting affidavits show that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. The district court must resolve all facts and reasonable inferences drawn from the evidence in favor of the party against whom the ruling [is] sought. When opposing summary judgment, a party must produce evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issue in the case. Appellate courts apply the same rules and, where they find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment is inappropriate. Appellate review of the legal effect of undisputed facts is de novo. [Citation omitted.]" *GFTLenexa, LLC v. City of Lenexa*, 310 Kan. 976, 981-82, 453 P.3d 304 (2019).

Likewise, when ruling on a motion for judgment as a matter of law:

"[T]he trial court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought. Where reasonable minds could reach different conclusions based on the evidence, the motion must be denied. A similar analysis must be applied by an appellate court when reviewing the grant or denial of a motion for [judgment as a matter of law]. [Citations omitted.]" *Dawson v. BNSF Railway Co.*, 309 Kan. 446, 454, 437 P.3d 929 (2019).

A considerable portion of the parties' arguments relate to whether the district court should have given certain instructions to the jury. In a civil case, the district court is

> "required to give an instruction supporting a party's theory [of the case] if the instruction is requested and there is evidence supporting the theory which, if accepted as true and viewed in the light most favorable to the requesting party, is sufficient for reasonable minds to reach different conclusions based on the evidence." *Puckett v. Mt. Carmel Regional Medical Center*, 290 Kan. 406, 419, 228 P.3d 1048 (2010).

Appellate courts consider jury instructions as a whole, without focusing on any single instruction, in order to determine whether they properly and fairly state the applicable law or whether they reasonably could have misled the jury. *Siruta*, 301 Kan. at 775.

To various extents, the issues on appeal also raise questions requiring us to interpret Kansas statutes governing corporations. Statutory interpretation presents a question of law over which appellate courts have unlimited review. *Nauheim v. City of Topeka*, 309 Kan. 145, 149, 432 P.3d 647 (2019).

*Discussion*

The parties' differing versions of events in their statements of facts show why both summary judgment and judgment as a matter of law are inappropriate. The record reflects numerous disputes of material fact underlying the various legal issues raised. The considerable factual disparities in the record arise because most of the witnesses at trial provided testimony showing conflicts between their statements on direct and cross-examination. Many of the witnesses were deposed prior to trial and were confronted with conflicts between their trial and deposition testimony. Further still, several of the witnesses offered testimony contradicting one another's accounts of the same incidents or circumstances, which created legitimate factual disputes as to their knowledge, conduct, and intent with respect to their own actions or inactions and those of the other witnesses.

14

*The evidence supported giving a jury instruction on the statute of limitations.*

The district court found there was no evidence presented that a nonculpable majority of disinterested directors existed more than two years before MCAC filed suit. In doing so, the district court applied an erroneous legal standard to the adverse domination theory MCAC relied on to avoid the statute of limitations. The reasoning the district court relied on comes from authority MCAC argues in its brief, which predates the 1996 legislative amendments to K.S.A. 60-513(d). Those amendments codified the disinterested majority version of adverse domination. Earlier versions of K.S.A. 60-513 did not have an explicit statutory provision tolling the statute of limitations on the basis of adverse domination. See L. 1996, ch. 127, § 1.

Prior nonbinding caselaw suggested a subjective standard applied to determine whether a corporation was adversely dominated by culpable directors. In essence, the degree of control a culpable director exerted over the company was a significant factor in the adverse domination inquiry. See *Resolution Trust Corp. v. Thomas*, 837 F. Supp. 354, 359 (D. Kan. 1993). But even before the Legislature amended K.S.A. 60-513, our Supreme Court concluded in *Resolution Trust Corp. v. Scaletty*, 257 Kan. 348, 356, 891 P.2d 1110 (1995): "[T]he disinterested majority version of the doctrine is more appropriate to the language and purpose of [K.S.A. 60-513(b)]." The court further explained: "In the disinterested majority version, 'claims by a corporation do not accrue and/or limitations do not run . . . until there exists a disinterested majority of nonculpable directors.' [Citation omitted.]" 257 Kan. at 351.

Nothing about the disinterested majority approach suggests a subjective standard. Here, however, the district court applied the type of subjective focus used by the court in *Thomas* based on Dr. Bassell's style of leadership. But the plain language of K.S.A. 60-513(d) states, in relevant part: "[T]he period of limitation shall not commence until the

15

fact of injury becomes reasonably ascertainable and there exists a disinterested majority of nonculpable directors of the corporation or association . . . ."

We presume the Legislature does not intend to enact meaningless legislation. *In re Marriage of Traster*, 301 Kan. 88, 98, 339 P.3d 778 (2014). When the Legislature revises an existing law, we presume the Legislature intended to change the law as it existed prior to the amendment. *Stueckemann v. City of Basehor*, 301 Kan. 718, 745, 348 P.3d 526 (2015). Generally, we presume the Legislature acts with full knowledge about the statutory subject matter, including prior and existing law and judicial decisions interpreting the same. *Ed DeWitte Insurance Agency, Inc. v. Financial Associates Midwest*, 308 Kan. 1065, 1071, 427 P.3d 25 (2018). But if the Legislature fails to modify a statute to avoid a standing judicial construction of the statute, courts presume the Legislature agrees with that judicial construction. *In re Adoption of G.L.V.*, 286 Kan. 1034, 1052, 190 P.3d 245 (2008). Based on the legislative amendment to K.S.A. 60-153, we presume the Legislature acted with the intent to modify prior law, i.e., to codify the disinterested majority interpretation of adverse domination in *Scaletty*, as opposed to approaches used by other courts prior to *Scaletty*.

When the Legislature changes the law, we must first attempt to ascertain "legislative intent through the statutory language [enacted], giving common words their ordinary meanings." *Nauheim*, 309 Kan. at 149. When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind its clear language and should refrain from reading something into the statute not readily found in its words. Where there is no ambiguity, we need not resort to statutory construction. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016). However, when the statute's language or text is unclear or ambiguous, we will turn to canons of construction or legislative history to construe the Legislature's intent. *Nauheim*, 309 Kan. at 150. There is nothing unclear or ambiguous about the plain language of K.S.A. 60-513(d). We need look no further than the words of the statute itself.

16

Whether there exists a disinterested majority of nonculpable directors presents an objective standard, which can be easily answered through the mechanical application of three simple questions. First: How many directors did the corporation have at the relevant time? Second: How many of those directors were allegedly involved in the wrongful conduct? Third: Of the directors not allegedly involved in the wrongful conduct, how many stood to benefit by failing to act? The first and second questions establish whether there was a majority of nonculpable directors. The third question establishes whether the majority of directors were both nonculpable *and* disinterested.

Here, the only directors allegedly involved in wrongdoing were Drs. Bassell and McKay. At the times relevant to Drs. Bassell and McKay's statute of limitations argument, the composition of MCAC's board of directors was:

- Drs. Bassell, McKay, Babiash, Castrisos, and Manry from mid-December 2015 until December 31, 2015—a three-to-two nonculpable majority;
- Drs. McKay, Babiash, Castrisos, and Manry from January 1, 2016, to February 16, 2016—a three-to-one nonculpable majority; and
- Drs. McKay, Babiash, Castrisos, Manry, Cremin, Dai, and George from February 16, 2016, to August 22, 2017—a six-to-one nonculpable majority.

MCAC did not file suit until March 7, 2018. A two-year statute of limitations applies to MCAC's claims. See K.S.A. 60-513(a). The first relevant inquiry is whether a nonculpable majority of directors existed prior to March 7, 2016. Here, the evidence showed a nonculpable majority existed at least as early as February 16, 2016, and possibly as early as mid-December 2015.

But the district court questioned whether the directors had been properly elected or appointed to the board because MCAC often did not have formal meetings, did not send out formal notices, and would take actions by unanimous written consent of the directors

17

as opposed to an in-person vote. The district judge referenced his personal experience with annual notices he had received as a stockholder in what appears to have been other publicly traded corporations. However, publicly traded corporations are generally required to send formal written notices based on federal statutes and regulations. In contrast, MCAC was a closely held Kansas corporation owned by Kansas stockholders utilizing different corporate rules. MCAC's bylaws specifically allowed for waiver of formal meetings and notices and for the board to act by unanimous written consent instead of in-person votes.

Under K.S.A. 2020 Supp. 17-6301(f), a corporation's board may act through unanimous written consent in lieu of meetings if its bylaws allow for it. K.S.A. 2020 Supp. 17-6501(c) provides, in relevant part: "A failure to hold any annual meeting at the designated time or to elect a sufficient number of directors to conduct the business of the corporation shall not affect otherwise valid corporate acts or work a forfeiture or dissolution of the corporation . . . ." Further, "[a] failure to elect officers shall not dissolve or otherwise affect the corporation." K.S.A. 2020 Supp. 17-6302(d).

The district court took the position that MCAC's bylaws were effectively invalid until sometime after February 2016 because, in its opinion, there had not previously been proper written notices of meetings given to MCAC's stockholders. This position ignores the plain language of MCAC's existing bylaws, which provided, in relevant part: "[T]he failure to give such notice shall not invalidate any such amendment, alteration or repeal of the By-Laws." But the district court believed the February 16, 2016 amendments to MCAC's bylaws were not actually effective until March 21, 2016—the date Dr. Manry signed the unanimous written consent amending MCAC's bylaws. By the district court's reasoning, MCAC did not have a validly elected board of directors until its bylaws were amended. But at the same time, the district court found the amendment to the bylaws was not effective until Dr. Manry, the last of the *prior* board members, signed. The district court's reasoning does not recognize the conduct of the board members.

18

At the hearing on the motion for summary judgment, the district court essentially found the February 16, 2016 meeting was otherwise properly conducted under MCAC's bylaws, even though the bylaws themselves were invalid. Yet, it reasoned a valid board of directors did not exist until all prior directors—a directorship it found *invalid*—signed the unanimous consent form. Then at trial, the district court took the position the February 16, 2016 meeting was actually invalid because Dr. Babiash sent out notice to the shareholders electronically as opposed to in writing. The district court ultimately concluded MCAC did not have a valid board until the August 2017 meeting at which five of the prior board members—also an ostensibly invalid directorship by the district court's reasoning—voted to add Dr. Cleveland to the board and terminate Drs. McKay and Manry. This reasoning ignores the facts that (1) all then-existing shareholders received notice of the February 2016 meeting and showed up for it, and (2) Dr. Babiash—now claiming to be aggrieved by Drs. Bassell and McKay—had the responsibility as MCAC's secretary to send out proper notice of meetings. Drs. Babiash and Cremin both testified in their depositions all shareholders were elected directors at the February 16, 2016 meeting. At trial, Dr. Manry testified every shareholder had been elected a director at the meeting. Despite evidence an in-person vote had taken place, the district court—having previously criticized MCAC for acting through written consent in lieu of meetings—took the position the result of the in-person vote was invalid at least until all previous directors signed a written consent.

The district court relied on an incorrect legal standard—putting form over substance—then misapplied the facts to its own erroneous framework. See *Gorrill v. Greenlees*, 104 Kan. 693, 699, 180 P. 798 (1919) ("If the governing body, the directors, act for the corporation, the result must be governed, not by the degree of formality observed, but by the practical and legal effect of such action."). To the extent there were any material disputes of fact as to whether MCAC properly elected or appointed its board of directors, the jury—not the district court—should have resolved the issue. There was

19

ample evidence from which a reasonable jury could conclude MCAC had a valid nonculpable majority of directors prior to March 7, 2016.

The next relevant inquiry is whether the nonculpable majority was disinterested. In other words, what would the nonculpable majority have to gain by failing to act? Here, MCAC alleged Drs. Bassell and McKay unfairly took excess compensation compared to the other physician shareholders. The nonculpable directors were all physician shareholders and, therefore, had nothing to gain by allowing the alleged wrongful conduct to continue. Accordingly, a reasonable jury could find there was a disinterested majority of nonculpable directors more than two years prior to MCAC filing suit.

But one salient question remains: Was MCAC's injury reasonably ascertainable prior to March 7, 2016? See K.S.A. 60-513(d). On this point, the district court also applied an erroneous legal standard. The district court seemingly took the position MCAC's injuries were not reasonably ascertainable until Dr. George examined the company's financial records in August 2017. The district court's position effectively conflates having *actual knowledge* of the extent of the injury with having *sufficient information to investigate* whether and to what degree an injury exists. "'Reasonably ascertainable'" does not require the plaintiff have "'actual knowledge'" of the extent of injury. *Davidson v. Denning*, 259 Kan. 659, 678-79, 914 P.2d 936 (1996); see also *Ives v. McGannon*, 37 Kan. App. 2d 108, 115, 149 P.3d 880 (2007) ("[T]he critical information to trigger the running of the statute of limitations is knowledge of the fact of injury, not the extent of injury."). And a plaintiff has an obligation to investigate its potential injury with due diligence to avoid having its claim barred by the statute of limitations. 37 Kan. App. 2d at 115.

Here, the district court found there was only suspicion among the other physicians that Drs. Bassell and McKay may have been paid more or were taking other actions detrimental to the company. The district court also substantially discounted the fact Dr.

20

Babiash had been receiving all the company's financial documents since sometime in 2014. The district court's reasoning is flawed.

First, a corporation is charged with knowledge of its own records, including financial information. A corporation acts through its directors. Those directors have an obligation to act in the corporation's best interests, which, therefore, requires them to keep apprised of the corporation's affairs. See *Weigand v. Union National Bank of Wichita*, 227 Kan. 747, 756, 610 P.2d 572 (1980); *Noll v. Boyle*, 140 Kan. 252, 255, 36 P.2d 330 (1934). There was no evidence Drs. Babiash, Castrisos, Manry, Cremin, Dai, and George were denied access to MCAC's financial records while Dr. Bassell was president. To the contrary, the one time Dr. Castrisos asked to look at MCAC's books, Dr. Bassell told him he could do so. Dr. Manry also recalled Dr. Bassell previously encouraging the shareholders to look at MCAC's books. Dr. Cremin acknowledged he knew as a shareholder he had access to MCAC's financial records. Dr. George was briefly delayed in receiving the requested records in August 2017. But he was promptly given everything he requested once Dr. McKay confirmed that Dr. Cleveland, an employee and not a director at the time when he accompanied Dr. George, was also permitted to inspect the records under MCAC's bylaws.

Second, MCAC's bylaws provided that its financial records were available for examination by its shareholders at any time. Under Kansas law, a corporation's shareholders also have a right to examine its financial records and may even obtain a court order compelling the company to allow such examination if the shareholders' request is denied. K.S.A. 2020 Supp. 17-6510(b)(1), (c). MCAC is a closely held Kansas corporation whose shareholders are all practicing physicians. All of the disinterested nonculpable directors were physician shareholders and, therefore, had the right to examine the company's records. Accordingly, in addition to their obligations to stay apprised of matters affecting the company, the nonculpable directors all had an ongoing professional and financial interest in making sure the company was properly managed.

21

And two of those directors—Drs. Babiash and Manry—acknowledged they were (1) aware compensation for the shareholders varied, and (2) previously had concerns about the way Dr. Bassell ran the company. Dr. Babiash explicitly conceded she "knew Bassell made more [than her] before [she] started [working for] the company." Further, Dr. Manry testified he assumed Dr. Bassell's pay was higher because he was president. Dr. Dai also acknowledged he was aware Dr. Bassell had the authority to set the physicians' salaries.

The other physicians' testimony reflects they had concerns with how Dr. Bassell managed the corporation and the amount of vacation he took and hoped the company would function more transparently and democratically under Dr. McKay. The record reflects numerous red flags to alert a reasonably prudent person to engage in some level of investigation or further inquiry. And the stockholders most directly affected by the past management of the corporation were highly educated professionals with a direct financial interest in the company and a right to access the company's documents.

Finally, Dr. Babiash began regularly receiving copies of MCAC's financial records nearly four years before MCAC filed suit. Dr. Babiash acknowledged that at least as early as December 2015, she was an officer and director of MCAC, serving as MCAC's secretary-treasurer. Per MCAC's bylaws, the duties of the secretary are:

> "The Secretary shall attend all sessions of the Board of Directors, and all meetings of the stockholders, and record all votes, and the minutes of all proceedings in a book to be kept for that purpose; and shall perform like duties for the Board of Directors. He shall give, or cause to be given, notice of all meetings of the stockholders and of the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors, or President, under whose supervision he shall be."

The duties of MCAC's treasurer are:

> "The Treasurer shall be responsible for the funds, books and records of the corporation and shall report to the Directors as required by the Board of Directors and shall have such other duties as may be prescribed by the Board of Directors."

In short, Dr. Babiash was responsible for keeping track of MCAC's corporate actions and meetings as secretary, as well as its financial records as treasurer. She was regularly given the same financial records Drs. Bassell and McKay received. She had both a bachelor's and master's degree in business administration. Dr. Babiash, Seiler, and Wolverton all agreed it only required simple math to determine the difference between what Drs. Bassell and McKay were paid versus the other doctors—Wolverton even used the same information Babiash had been given to determine MCAC's damages. Yet, despite her responsibilities as treasurer, Dr. Babiash essentially claimed she never bothered to look at the financial documents because she did not feel it was necessary or important to do so. And at trial, Dr. Babiash's testimony on cross-examination was inconsistent with prior testimony from her deposition about her awareness of MCAC's financial records.

Here, Drs. Babiash, Castrisos, and Manry acknowledged they acted as directors of MCAC and were aware of their status as such at least as early as December 2015. They had a right to access MCAC's financial records—records Dr. Babiash was regularly provided without request—and had ample time, knowledge, and reason to perform some level of investigation based on Dr. Babiash's and the other physicians' concerns about how Drs. Bassell and McKay ran the company.

Viewed in a light most favorable to Drs. Bassell and McKay, the evidence and rational inferences fairly reflect a fact question for the jury to resolve on whether MCAC's injuries were reasonably ascertainable more than two years before the action

23

was filed. Accordingly, the district court erred in granting MCAC's motion for judgment as a matter of law to strike the defendants' statute of limitations defense after all evidence had been presented. We reverse and remand for a new trial based on the district court's failure to instruct the jury on the statute of limitations as to when MCAC's alleged injuries were reasonably ascertainable.

*Drs. Bassell and McKay were not entitled to judgment based on the statute of limitations.*

Although we have found the district court should have instructed the jury on the statute of limitations and allowed Drs. Bassell and McKay to present the defense, it was not error for the district court to deny Dr. Bassell's and Dr. McKay's motions for summary judgment and judgment as a matter of law based on the statute of limitations. The evidence supporting the statute of limitations defense appears fairly strong, but it is not our role—nor was it the district court's role—to weigh credibility or resolve conflicting evidence. There is at least *some* evidence suggesting Drs. Bassell and McKay may have covered up their alleged wrongful acts, resulting in a fact question for the jury.

Drs. George and Babiash both claimed they asked for copies of MCAC's bylaws from McKay in early 2016, and McKay told them MCAC's legal documents had been lost in a flood. Dr. George also claimed Dr. McKay called him after he went to Holdeman's office in August 2017 and "was fairly agitated and kind of scolded me for going into the office without giving [Holdeman] time to make sure I got accurate information . . . ." Dr. George thought it was suspicious Dr. McKay used the term "accurate information." He felt the information on Holdeman's computer should have been accurate to begin with, and Dr. McKay "was agitated [because] they didn't have time to clean it." Dr. George further claimed that when Holdeman turned over the financial records to him and Dr. Manry, she said: "I have been told all of these years to hide this stuff . . . ." Dr. George admitted he could not point to anything in writing

24

showing Holdeman was told to conceal information, and Holdeman's and Dr. Manry's testimony did not corroborate Dr. George's account. But conflicts or ambiguities in the evidence are questions we must leave for the jury to resolve.

There were also conflicts in the evidence and/or issues of credibility as to how much Dr. Babiash understood about MCAC's financial records, whether or when she had any cause for concern, or what she would have been able to ascertain from the records she was sent. At trial, Dr. Babiash admitted she knew Dr. Bassell made more than her but suggested she believed it could have been for administrative duties or extra shift pay. Dr. Babiash mentioned there were potentially other sources of income that could account for disparities in Dr. Bassell's pay, although she did not specify the nature of those sources. Dr. Babiash was confronted with a considerable amount of inconsistent prior testimony from her deposition wherein she stated that, as early as 2012, she felt Dr. Bassell was mismanaging the company by taking excess vacation and, as early as 2014, she knew Dr. Bassell's salary was much higher than the other physicians. The record reflects she took no action given her concerns, but, again, those are issues for the jury to resolve.

Additionally, there was a fair amount of evidence suggesting Drs. Bassell and McKay were respected and admired by the other doctors—particularly Dr. Manry—to the extent the other doctors took Drs. Bassell and McKay at their word. Dr. Bassell claimed he discouraged the other doctors from talking about their bonuses to avoid back-biting and division among the group. While Drs. Babiash and Manry were aware the physicians' salaries and bonuses differed, Drs. Bassell and McKay never explicitly disclosed their salaries or bonuses to the other doctors.

The district court properly denied Dr. Bassell's and Dr. McKay's motions for summary judgment and judgment as a matter of law on the statute of limitations. A reasonable jury could have found Drs. Bassell and McKay sufficiently concealed any

25

potential wrongdoing to the point MCAC's injuries were not reasonably ascertainable prior to March 7, 2016.

*Ratification, authorization, and estoppel*

Dr. Bassell asserts the district court erred in not instructing the jury on ratification, authorization, and estoppel as a defense. See K.S.A. 2020 Supp. 17-6304(a)(3) (self-interested action by corporate officer is not voidable if "the contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified by the board of directors, a committee or the stockholders."). His argument on this point is not particularly well developed. MCAC is generally correct in arguing even if the district court should have given the instruction, there was no prejudice in failing to do so because the jury found Dr. Bassell never disclosed his salary and did not act in good faith. The jury could not have found MCAC ratified or authorized Dr. Bassell's actions in taking excess salary if it found Dr. Bassell never disclosed his salary. And Dr. Bassell's actions could not have been "fair as to the corporation as of the time [they were] authorized" if he did not act in good faith. See K.S.A. 2020 Supp. 17-6304(a)(3). Although Dr. Bassell had the power as president to set everyone's salaries, his power could have been rescinded. Just because the board never took away Dr. Bassell's power does not mean his actions were ratified by MCAC. A reasonable jury could have found the board never knew it had reason to do so. Here, the board's failure to act does not mean it had sufficient knowledge of the facts even if it should have.

Still, Dr. Bassell is entitled to a new trial because the district court should have allowed him to present a statute of limitations defense. On retrial, whether an instruction on ratification, authorization, or estoppel should be given necessarily depends on the evidence presented in those proceedings. We decline to further comment on this point.

26

*Dr. McKay was not entitled to judgment as a matter of law on MCAC's civil conspiracy claim.*

Dr. McKay argues he was entitled to judgment as a matter of law on MCAC's civil conspiracy claim because no evidence was presented showing a "meeting of the minds" between Drs. Bassell and McKay.

"Kansas recognizes the five elements of a civil conspiracy to include: '(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof.' [Citations omitted.]" *State ex rel. Mays v. Ridenhour*, 248 Kan. 919, 927, 811 P.2d 1220 (1991).

On this issue, Dr. McKay relies on his and Dr. Bassell's testimony to show there was never any meeting of the minds. The fact Drs. Bassell and McKay denied they conspired does not prevent a reasonable jury from inferring a meeting of the minds based on other evidence. There was evidence Drs. Bassell and McKay were the only physicians aware of the other doctors' compensation. Holdeman sent all financial records only to Drs. Bassell and McKay until Dr. Bassell had Holdeman start sending them to Dr. Babiash in 2014. At the time Dr. Babiash was hired, Drs. Bassell and McKay told her compensation varied based on the physicians' administrative duties.

This evidence could lead a reasonable jury to infer Drs. Bassell and McKay agreed to take excess compensation because they both: (1) told Dr. Babiash their salaries differed; (2) had regular access to MCAC's financial records; and (3) jointly explained the basis for the pay discrepancy to Dr. Babiash—the one person with whom they later shared MCAC's financial records. Drs. Babiash and George alleged Dr. McKay did not timely give them access to MCAC's bylaws shortly after Dr. Bassell retired. Dr. George further alleged Dr. McKay became upset when Dr. George asked Holdeman for MCAC's financial records; and when Holdeman turned them over, she said she had been "told all

27

of these years to hide this stuff." A reasonable jury could infer Dr. McKay's alleged actions in denying or attempting to deny Drs. Babiash and George access to MCAC's legal documents and financial records showed he was aware of and trying to cover up past wrongdoings in which he and Dr. Bassell were jointly involved. The district court did not err in denying Dr. McKay's motion for judgment as a matter of law on MCAC's civil conspiracy claim. Whether the same ruling on retrial will be correct, we leave to the district court to determine based on the evidence produced in those proceedings.

Reversed and remanded with directions for a new trial.